N. Paul Kenworthy and Dorothy F. Kenworthy * v. Commissioner. Kenworthy v. Commissioner
Docket Nos. 29355, 29356, 29357, 29358, 29359, 29360.
United States Tax Court
1952 Tax Ct. Memo LEXIS 344; 11 T.C.M. (CCH) 60; T.C.M. (RIA) 52013; January 25, 1952
*344 Three partners purchased the entire interest of a fourth partner in a well-established business for $70,000. They also paid $5,000 attorney's fees in connection with such purchase. Held, such sums were capital expenditures and not ordinary and necessary expenses. James A. Moore, Esq., 2228 Land Title Bldg., Philadelphia, Pa., and B. Graeme Frazier, Jr., Esq., for the petitioners. Stanley W. Herzfeld, Esq., for the respondent. RICE
Memorandum Findings of Fact and Opinion These consolidated cases involve income tax deficiencies for the calendar years 1947 and 1948 as follows: 1947
Docket
Taxpayer
No.
Deficiency
Thomas Kenworthy
29356
$22,666.79
N. Paul Kenworthy
29357
22,585.58
Thomas Kenworthy, III
29358
4,341.15
1948
Thomas Kenworthy and
Marie Kenworthy
29359
$ 1,372.16
N. Paul Kenworthy and
Dorothy F. Kenworthy
29355
1,270.50
Thomas Kenworthy, III and
Mary Wells Kenworthy
29360
657.80
*345 The issue is whether the payment of $70,000 in 1947, by or for the accounts of the petitioners to procure the withdrawal of a partner from the firm, and the payment of $5,000 in 1948, as attorney fees in connection therewith, should be treated as expense items, as reported by petitioners, or as capital items, as determined by the respondent. The possibility that the $70,000 payment might be held to be a partnership expense item for the fiscal year 1948 caused petitioners to amend their petitions for 1948 and allege that their pro rata shares of the $70,000 payment were ordinary and necessary expenses for the calendar year 1948. By virtue of the claimed additional deductions, petitioners allege, in effect, that they have overpaid their 1948 income taxes in the following amounts: 1948
Docket
Over-
Taxpayer
No.
payment
Thomas Kenworthy and
Marie Kenworthy
29359
$21,465.90
N. Paul Kenworthy and
Dorothy F. Kenworthy
29355
20,195.40
Thomas Kenworthy, III and
Mary Wells Kenworthy
29360
4,596.36
Some of the facts were stipulated. Findings of Fact The stipulated facts are so found and are incorporated herein. The petitioner are individuals, *346 with residences as follows: Thomas and Marie Kenworthy, Limekiln Pike and Waverly Road, Glenside, Pennsylvania. N. Paul and Dorothy F. Kenworthy, Dale Road, Meadowbrook, Pennsylvania. Thomas and Mary Wells Kenworthy, III, Casita, Limekiln Pike and Waverly Road, Glenside, Pennsylvania. Thomas Kenworthy, N. Paul Kenworthy, and Thomas Kenworthy, III, were partners in the firm of Thos. Kenworthy's Sons in the fiscal years of the partnerships ending June 30, 1947, and June 30, 1948. The partnerships of Thos. Kenworthy's Sons filed income tax returns for such fiscal years, and used the accrual method of accounting. The petitioners filed their individual income tax returns for the taxable years 1947 and 1948 on the calendar-year basis, and used the cash receipts and disbursements method of accounting. Thomas Kenworthy, N. Paul Kenworthy, and Thomas Kenworthy, III, filed individual returns for the calendar year 1947. The petitioners filed joint returns for the calendar year 1948. The returns were filed with the collector for the first district of Pennsylvania. Thos. Kenworthy's Sons was formed as a partnership in 1894 in Philadelphia, Pennsylvania, by Joseph Kenworthy and Samuel *347 P. Kenworthy, sons of Thomas Kenworthy, deceased, to engage in the business of importing and selling carpet wool. The capital contributions of Joseph and Samuel P. Kenworthy at that time were: Joseph Kenworthy
$78,131.29
Samuel P. Kenworthy
22,062.50
From 1894 through June 30, 1947, there were at least nine separate partnerships that engaged in the business of importing and selling carpet wool under the firm name of Thos. Kenworthy's Sons. Over the period of 53 years covered by these several partnerships, five new partners were admitted, the two original partners died, and one partner retired. Except for the two original partners, none of the partners made a capital contribution of any kind to the partnerships. Following the deaths of each of the original partners, their estates were paid nothing for good will or any other intangible asset by the partnership or any individual partner. Upon the retirement of the partner aforementioned, nothing was paid to him or his estate for good will or any other intangible asset by the partnership or any of the individual partners. The partnership agreement of June 30, 1926, carried a provision that any partner had the right *348 to withdraw at the end of the partnership fiscal year upon giving 30 days' written notice of such intention. Each of the partnership agreements executed thereafter contained a similar provision. Oscar A. Fow became a partner in the firm of Thos. Kenworthy's Sons on July 1, 1930. Prior thereto he had been an employee of the firm. He severed his connection with the firm on or about July 3, 1947. On July 1, 1946, a partnership agreement was entered into between Thomas Kenworthy, N. Paul Kenworthy, Oscar A. Fow and Thomas Kenworthy, III, in Philadelphia, Pennsylvania, for engaging in business as importers and dealers of carpet wool under the firm name of Thos. Kenworthy's Sons. This agreement was in effect on July 3, 1947. The pertinent portions thereof are as follows: "* * * That said partnership shall continue from July 1, 1946 to June 30, 1947 and unless dissolved by a mutual consent shall continue from year to year subject to dissolution by mutual consent on June 30th of any year and at no other date. Any partner shall have the right to withdraw on June 30, 1947 or on June 30th of any subsequent year during the continuance of this agreement upon the terms hereinafter set forth *349 upon the giving of thirty days written notice of such intention to withdraw before June 30, 1947 or in any subsequent year during the continuance of this agreement. * * *
"The said Thomas Kenworthy, N. Paul Kenworthy, Oscar A. Fow and Thomas Kenworthy, 3rd shall respectively contribute to the partnership their respective capital credits standing upon the books of the former firm of Thos. Kenworthy's Sons and shall share any profits and losses on the following basis: * * *
"In the event of the withdrawal of any partner or partners upon the Thirtieth day of June of any year, the remaining partner or partners shall have the right to continue to carry on the business without winding up the partnership affairs. "The value of the share or interest of such retiring partner or partners or of any partner or partners so dying during the partnership year shall be determined as of June Thirtieth, * * *
"The withdrawal or death of any partner or partners shall not be deemed to prevent or interfere with the continuance of the partnership business by the remaining partner or partners or to necessitate the winding up of the partnership business. The payment of the value of the *350 share of any dying or retiring partner or partners in either of the methods herein provided, shall absolutely end such retiring or deceased partner's or partners' rights or interests in the firm's business or assets." * * *
The credit balances in the capital accounts of the partners on the books of the former firm of Thos. Kenworthy's Sons which were transferred to the books of the newly created partnership under the agreement of July 1, 1946, were as follows: Thomas Kenworthy
$532,974.09
N. Paul Kenworthy
173,841.32
Oscar A. Fow
142,859.20 The capital accounts of these partners on the books of the former firm and on the books of the partnership created by the agreement of July 1, 1946, were the only capital accounts of the partners on the books. The above credit balances represented that share of partnership income which had not been withdrawn by the partner during the membership of such partner in any partnership or partnerships doing business under such firm name. The ordinary net income and gross receipts from sales by the partnerships doing business as Thos. Kenworthy's Sons for the 11 fiscal years ending June 30, 1948, as reflected by the income *351 tax returns filed by the partnerships, were as follows: Fiscal
Year Ended
Ordinary
Gross Receipts
June 30
Net Income
From Sales
1938
$ 26,189.73
$ 3,665,256.83
1939
46,721.85
3,636,740.28
1940
86,416.86
6,639,544.78
1941
568,127.47
10,313,073.95
1942
512,065.56
7,659,050.71
1943
195,317.31
880,503.97
1944
142,643.57
2,612,679.84
1945
164,900.96
3,369,261.16
1946
298,941.18
7,953,356.41
1947
270,833.80
9,086,771.68
1948
298,436.15
10,791,754.10
The ordinary net income of the partnership for the fiscal year ended June 30, 1947 ($270,833.80) included the following amounts, debited on the partnership books to a salary account of each partner: Thomas Kenworthy
$5,200
N. Paul Kenworthy
5,200
Oscar A. Fow
5,200
Thos. Kenworthy, III
4,160
The capital account of each partner was credited with his share of income, and debited with his withdrawals against income during the fiscal year ended June 30, 1947. Oscar A. Fow's share of partnership income for the fiscal year ended June 30, 1947, exceeded his withdrawals during the fiscal year by $21,776.89. This sum, when added to his capital account as of June 30, 1946, reflected *352 a credit balance as of June 30, 1947, of $164,636.09. Prior to 1940, Fow began drinking intoxicating liquor to excess. During the period 1940 through 1946, the partners had frequent discussions with Fow about his excessive drinking. By December, 1946, the situation had become so intolerable that early in 1947 Fow agreed to go to a sanitarium for treatment the expense of which was paid by the partnership. He was assured by the other partners that, if a cure was effected, his previous misconduct would be forgotten. Instead of completing the treatment, Fow returned after two months, and shortly thereafter resumed his drinking habits. In May, 1947, the other partners decided that Fow's actions threatened their personal and firm assets, and that some kind of agreement should be worked out with him for their own protection. The problem was presented to their attorney who drafted a supplement to the partnership agreement of July 1, 1946, which permitted the partners by a majority vote to terminate Fow's interest in the partnership at the end of any calendar month, but in most other respects continued the partnership as before. In the event of the termination of Fow's interest and membership *353 in the partnership, the value of his interest was to be determined as provided in the partnership agreement, but at the end of the month of termination instead of at the end of the firm's fiscal year, and payment therefor was to be made after June 30th following termination at the time and in the manner provided in the partnership agreement of July 1, 1946. The right of the remaining partners to continue the business without winding up the partnership affairs was specifically reserved in the supplemental agreement. The supplement to the partnership agreement was dated May 29, 1947, and was presented to Fow for his signature on or about that date. Fow procrastinated over executing the instrument and took it home over the Memorial Day week end. When Fow returned to the office in the first week of June, it was too late to give the required thirty-day written notice of intention to withdraw from the partnership on June 30, 1947. Instead of executing the supplemental agreement, as the Kenworthys had been led to believe, Fow notified them that he had engaged counsel and was going to stand on his legal rights. During June, 1947, and until July 3, 1947, the attorneys for Fow and the Kenworthys *354 were negotiating to effect a settlement between the partners. Fow was willing to get out, but his original asking price was unacceptable to the Kenworthys. The latter were pressing for settlement by June 30, 1947, the end of the partnership's fiscal year. After numerous conferences the attorneys submitted to their respective clients, on or about July 3, 1947, a figure of $70,000 to be paid by the Kenworthys to Fow over and above the latter's capital account on June 30, 1947, adjusted as hereinafter mentioned. The several partners accepted the settlement arrived at by their attorneys on the same day. Their agreement is set forth in a letter dated July 3, 1947, which Fow addressed to the three Kenworthys individually as partners of Thos. Kenworthy's Sons. The Kenworthys noted thereon their acceptance of Fow's proposal. The agreement reads, in part, as follows: "Gentlemen: "For and in consideration of the sum of $227,623.46, to me in hand paid by or for the account of Thomas Kenworthy, N. Paul Kenworthy, and Thomas Kenworthy, 3rd, partners of Thos. Kenworthy's Sons (other than myself), receipt whereof is hereby acknowledged, I hereby agree with the said partners as follows: "1. *355 To assign, and I do hereby irrevocably assign, transfer and set over unto Thomas Kenworthy, N. Paul Kenworthy, and Thomas Kenworthy, 3rd, remaining partners of Thos. Kenworthy's Sons, as their several interests may appear, all my right, title and interest as a partner in the said firm, its assets, good will and said firm name, and all my rights under partnership agreement dated July 1, 1946. "2. It is agreed that said remaining partners may continue to carry on said business under said firm name without winding up the partnership affairs. "3. In further consideration hereof it is agreed that a certain Cadillac automobile purchased by and registered in the name of the firm and heretofore used by me for the most part in the business of the firm and now standing on the books of the firm at a depreciated value of $3,175.79, shall be transferred by the firm to me and thereafter shall remain as my sole property. "4. I shall be responsible for and pay the U.S. income taxes on my share of the profits of said firm for the firm fiscal year ending June 30, 1947, which profits are included in the above consideration, as well as such other taxes as may be assessed against me. "5. It is *356 agreed that I shall remove my personal property from the firm premises as promptly as may be convenient. "6. It is agreed that I shall have the right, until July 18, 1947, to avail myself of the opportunity of inspection of the books and records of the firm for the purpose, inter alia, of making a list of persons and corporations with which the firm may presently do business. "7. It is agreed that if I so elect I may engage in a similar line of business alone or with others. "8. Appropriate announcement will be made by Thos. Kenworthy's Sons to the substantial effect that "Mr. Oscar A. Fow has retired as a partner in the firm of Thos. Kenworthy's Sons." Counsel for the remaining partners will effect appropriate withdrawal of registration of Oscar A. Fow as a member of said firm under the Fictitious Names Act and for that purpose Oscar A. Fow will execute the necessary documents. "9. The execution and delivery of this undertaking by me and the acceptance thereof by the remaining partners of Thos. Kenworthy's Sons shall operate as a full mutual release and discharge of all past and present claims and obligations whatsoever, whether in law or in equity, as between the undersigned *357 Oscar A. Fow, of the one part, and the firm of Thos. Kenworthy's Sons and Thomas Kenworthy, N. Paul Kenworthy, and Thomas Kenworthy, 3rd, individually and as remaining partners of said firm, of the other part. "IN WITNESS WHEREOF, intending to be legally bound, I have hereunto set my hand and seal as of the close of June 30, 1947. "(Sgd) Oscar A. Fow / "Oscar A. Fow" (SEAL) On July 1, 1947, Fow withdrew $3,000 from the firm. The depreciated value of the Cadillac automobile transferred to Fow in accordance with paragraph 3 of the agreement of July 3, 1947, was $3,175.79. Philadelphia income tax paid by the firm for Fow for the period July 1, 1946 to June 30, 1947, amounted to $836.84. On July 3, 1947, Fow received a check from Thos. Kenworthy's Sons in the amount of $227,623.46. On the books of account of Thos. Kenworthy's Sons. debit entries were made in the capital account of Oscar A. Fow to reflect the withdrawal of $3,000 by Fow on July 1, 1947, the accrual of Philadelphia income tax of $836.84, the depreciated value of the Cadillac automobile of $3,175.79 and the payment of $227,623.46 to Fow on July 3, 1947. [1] A credit entry of $70,000 was made in said account and debit *358 entries were made to the capital accounts of Thomas Kenworthy, N. Paul Kenworthy and Thomas Kenworthy III in the respective amounts of $30,800.20, $30,800.20 and $8,399.60. These were denominated on the books as "nuisance value payments." On or about July 5, 1947 Thomas Kenworthy, N. Paul Kenworthy and Thomas Kenworthy III entered into a partnership agreement for carrying on the business of importers and dealers in carpet wool under the firm name of Thos. Kenworthy's Sons. On December 28, 1947, Thos. Kenworthy's Sons paid B. Graeme Frazier $7,500, of which $5,000 was in payment for legal services in connection with the negotiations leading to the execution of the agreement dated July 3, 1947. Pursuant to the provisions of paragraph 6 and 7 of the agreement of July 3, 1947, Fow took certain information from the books and records of *359 the partnership and entered into business for himself. He was able to do some business with customers of Thos. Kenworthy's Sons, but his competition had no apparent effect on the firm's business. After Fow's departure, the firm's operations, the relationships between partners, and the firm's relationships with its customers were better. Fow's compesation did not continue for long as he died from chronic alcoholism in June, 1950. The various partnerships that operated under the name of Thos. Kenworthy's Sons from 1894 through the taxable years have all been engaged in importing and selling carpet wool. The several partnerships had agents and connections in the foreign ports of all countries producing carpet wool. These agents dealt with "up-country" buyers who acquired the wool produced in their localities. There is no open market for carpet wool, and the maintenance of these agents and connections by Thos. Kenworthy's Sons in foreign countries was the lifeblood of its wool-importing business. The various partners composing Thos. Kenworthy's Sons were constantly visiting their foreign agents to maintain and perpetuate these connections. When said foreign agents and their families *360 visited this country, the partners entertained them. The wool purchased through these connections was sold principally to carpet manufacturers, primarily through personal solicitation by a particular partner with a particular customer. Ordinarily a carpet manufacturer buys wool from various importers, and during 1947 Thos. Kenworthy's Sons had five important competitors. Sales to a particular customer, percentage-wise, would vary considerably depending upon the contacts the firm had with that customer. In the fiscal year ended June 30, 1947, 98.37 per cent of the sales of Thos. Kenworthy's Sons were to eight customers. Three of these companies became customers of Thos. Kenworthy's Sons in some year before 1928, and the other five companies became customers in some year before 1902. Each of these customers did business with Thos. Kenworthy's Sons in each year after it first became a customer through the fiscal year ended June 30, 1950. The balance sheets of Thos. Kenworthy's Sons, as reported on the partnership returns for the fiscal years ended June 30, 1947, and 1948, show the following assets and liabilities: ASSETS
July 1, 1946
June 30, 1947
June 30, 1948
Cash
$ 215,829.84
$280,533.54
$ 310,828.57
Notes and Accounts Receivable (less Reserve)
897,746.98
346,459.02
555,413.51
Inventories
643,526.42
179,453.41
573,550.38
Investments
50,000.00
Depreciable Assets
18,187.14 [1]
17,071.11 [2]
Total Assets
$1,807,103.24
$824,633.11
$1,533,434.42
LIABILITIES
Accounts Payable
$ 370,236.54
$108,395.37
$ 224,228.87
Notes and Mortgages
586,856.34
400,000.00
Other Liabilities
335.75
3,071.99
274.28 [3]
Partners' Capital Accounts
849,674.61
713,165.75
908,931.27
Total Liabilities
$1,807,103.24
$824,633.11
$1,533,434.42
*361 Thos. Kenworthy's Sons owned no patents, trade-marks, trade names, or exclusive agency contracts. Its advertising costs were about $50 a year. It did not carry good will as an asset on the books of the partnership, and prior to 1947 there had been no suggestion that any good will value attached to the firm of Thos. Kenworthy's Sons. The partnership agreement dated July 1, 1946 provided that Thomas Kenworthy III was entitled to 8 1/3 per cent of the profits and that Thomas Kenworthy, N. Paul Kenworthy and Oscar A. Fow were each entitled to an equal share of the balance. The income tax return of the partnership for the fiscal year ended June 30, 1947, showed distributive income to the partners as follows: Thomas and N. Paul Kenworthy, $51,117.91 each; Thomas Kenworthy III, $16,679.87; Oscar A. Fow, $151,918.11; or an ordinary net income for the partnership of $270,833.80. The partnership return carried the following explanation of the Fow transaction: *362 "To avoid litigation and procure the resignation of Oscar A. Fow from the partnership at June 30, 1947, a nuisance value payment of $70,000 was made to the said Fow. This payment was not made for the purpose of acquiring any interest or assets and is therefore not considered a capital transaction. The payment of $70,000 is credited to Fow in the distribution reflected herein, whereas the proportion thereof chargeable to each of the other partners is deducted in determining the income indicated as accruing to them." The individual income tax returns of the three Kenworthys for the taxable year 1947 reported their distributive shares of the partnership income in the amounts set forth in the partnership return. In determining the deficiencies for 1947, respondent restored to income the amount deducted by each of the Kenworthys in computing his distributive share of the partnership income. The acquisition of Oscar A. Fow's interest in the partnership of Thos. Kenworthy's Sons was a capital transaction, and petitioners are not entitled to deduct their proportionate part of the cost as an ordinary and necessary expense of the taxable year 1947. On their income tax returns for the *363 taxable year 1948, which were joint returns, the petitioners deducted a proportionate part of the $5,000 paid as attorney fees in settlement of the dispute with Oscar A. Fow. In determining the deficiencies for 1948, respondent restored to income the amount deducted by each of the Kenworthys ($1,925, $1,925, and $1,150) as his proportionate part of the cost of employing counsel in the Fow dispute. The $5,000 attorney fee paid by the partnership in 1948 in connection with the settlement of the Fow dispute was a capital expenditure, and was not an ordinary and necessary expense in carrying on a trade or business. Opinion RICE, Judge: The basic question in these consolidated cases is the proper characterization to be given the $70,000 payment to Fow over and above the amount of his capital account as of June 30, 1947. The parties are agreed that the attorney fees paid for legal services in connection with the Fow settlement will take the same character. We will discuss only the $70,000 since there is no dispute between the parties with respect to the remainder of the $227,623.46 received by Fow on July 3, 1947. Petitioners' main contention is that the $70,000 was paid to preserve *364 and protect their business. It is their contention that Fow's misconduct was damaging the business, that it could reasonably be expected that his actions would continue to damage the business, and that his withdrawal from the firm was necessary. It is also contended that they acquired no capital asset by the payment of the $70,000. Finally, it is contended that $60,000 of the $70,000 payment was in lieu of Fow's anticipated earnings from the partnership for the fiscal year ended June 30, 1948. Petitioners cite A. King Aitkin, 12 B.T.A. 692 (1928); and Charles F. Mosser, 27 B.T.A. 513 (1933). Respondent contends that the payment to Fow was a capital expenditure which did not reduce the distributive income from the partnership of any of the Kenworthys and did not constitute an ordinary and necessary business expense. He contends that by making the $70,000 payment the Kenworthys secured assets which they would not have had if they had retired after giving the 30-day written notice required by the partnership agreement, namely, the going business, the firm assets, the right to use the firm name, good will, and all of Fow's rights under the partnership agreement *365 of July 1, 1946. Much of the argument by petitioners has been directed toward establishing that no good will was involved in the settlement with Fow. Petitioners offered a substantial amount of evidence tending to prove that the partnership earnings were derived from personal solicitation and contacts and not because of the existence of good will. They also established that good will had not been recognized as an asset at any time where a partner had died, or where a new partner had been admitted into the firm, and that no account therefor was carried on the books of the partnership. This proof was apparently for the purpose of taking these cases out from under the rule of Aaron Michaels, 12 T.C. 17 (1949); Rodney B. Horton, 13 T.C. 143 (1949), Richard S. Wyler, 14 T.C. 1251 (1950), and like cases, which have held good will under certain circumstances to be a vendible capital asset. Petitioners argue that the present situation does not involve any appreciable good will value, and that it is comparable to Estate of Leopold Kaffie, 44 B.T.A. 843 (1941) and Estate of Henry A. Maddock, 16 T.C. 324 (1951), where the efforts *366 of the partners, their business ability, and other personal factors were responsible for earnings rather than good will. We are not convinced that the question for decision turns upon the existence or lack of existence of valuable good will. In our opinion it is one of the factors to be considered; but it is not decisive. More important is the nature of the transaction consummated on July 3, 1947, and the intent of the parties participating in that transaction. The intent of the parties is ascertainable from the agreement entered into on July 3, 1947, when analyzed in the light of the partnership agreement of July 1, 1946, and the circumstances which led up to the execution of the July 3, 1947, agreement. The circumstances forming the back drop to the July 3, 1947, agreement can be briefly summarized. For over 50 years Thos. Kenworthy's Sons had been engaged in the importation and sale of carpet wool. The business was mainly a family affair with only Fow and one other partner being strangers to the name. The evidence shows that Fow's drinking habits had become a matter of personal and business concern to the Kenworthys prior to July 3, 1947. The firm had financed a treatment cure *367 for Fow without effecting the cure. By Memorial Day of 1947 the Kenworthys had reached the limit of their endurance and patience They sought to protect their personal and the partnership's assets from Fow's misconduct first by amending the partnership agreement so that the firm would exist on a month-to-month basis. Failing in this, and confronted with a partner insisting on his legal rights, they authorized their attorney to negotiate with Fow's attorney to effect a settlement. Counsel for Fow and the Kenworthys have testified at length as to the moves and counter moves made by the opposing parties in arriving at a price on which they could settle. These negotiations continued for a month with each side bargaining for its own best interests. The amount of $70,000 ultimately agreed upon was a compromise settlement. But the cash payment was not the only consideration that moved between the parties. Each partly mutually released and discharged the other or others of all past and present claims and obligations in law or in equity. The Kenworthys agreed to announce that Fow had "retired as a partner in the firm." Fow was given the right to inspect the books and records of the firm for *368 the purpose of making a list of the firm's customers and was specifically authorized to engage in a similar line of business alone or with others. On their part the Kenworthys intended to and did acquire all of Fow's right, title, and interest as a partner in the firm, its assets, good will, and said firm name, together with all of Fow's rights under the partnership agreement of July 1, 1946. In addition, Fow specifically agreed that the Kenworthys could continue to carry on the business under the firm name without winding up the partnership affairs. In view of their determination to sever their relationship with Fow at the earliest possible moment after Fow's rejection of the supplemental agreement, and in view of the nature of the settlement, we are convinced that the Kenworthys intended to and did purchase Fow's interest. We are also convinced that the transaction was capital in nature, and that respondent properly characterized it as such. In so holding, we have carefully considered petitioners' numerous authorities, including the Aitkin and Mosser cases, supra. The present cases are distinguishable in that each of the petitioners herein acquired a proportionate part of Fow's *369 partnership interest by their payments, whereas, Aitkin and Mosser acquired no increased interest in their partnerships by their payments. In the Aitkin case we found specifically that the $5,000 additional payment "was not made for any assets, tangible or intangible," and that the additional amount was paid by the taxpayers "to protect themselves against the injury which they anticipated would result from a continuance of the partnership." We held that a payment under such circumstances was directly connected with and proximately resulted from the taxpayers' business, and was deductible under Kornhauser v. United States, 276 U.S. 145 (1928). The Mosser case follows the Aitkin case and quotes therefrom. The activities of Mosser's son-in-law were damaging the partnership's business and Mosser paid his son-in-law $15,000 to withdraw from the firm. Mosser acquired no part of his son-in-law's partnership interest by this $15,000 payment. Our findings in that case show that the taxpayer's sons purchased their brother-in-law's partnership interest in a separate transaction. We pointed out that a payment in excess of a retiring partner's investment, where no asset was acquired, *370 was held to be a deductible expense in the Aitkin case, and that the same rule applied to Mosser's payment. A case more in point than either the Aitkin or Mosser cases is Burt L. Davis, et al., 26 B.T.A. 218 (1932). There, two partners, the Davis brothers, paid $90,000 to procure the retirement of a third partner, Hougard, from a general insurance brokerage agency. The issue was whether such payment was a capital expenditure, a loss, or a business expense. We held that the payment was a capital expenditure, made to acquire a one-third interest in the tangible and intangible assets of the partnership. We thought the good will of the insurance agency was a valuable partnership asset, Hougard's interest in which was acquired by the Davis brothers, but we were careful to point out that Hougard's interest in the partnership's good will was acquired along with other partnership assets in consideration of the payment of $90,000. [2]
In the Davis case we enumerated some of the tangible and intangible assets acquired by the $90,000 payment to the retiring *371 partner. A comparison of the assets acquired in that case with the assets (other than good will) acquired by the Kenworthys for their $70,000 payment in the present cases presents striking similarities. In each instance the agreement, settling the dispute between the partners, provided that: (1) the purchasers acquired all the right, title and interest of the retiring partner, (a) in and to the partnership name and the use thereof; (b) in and to the firm assets, which was spelled out in the Davis case as all furniture, fixtures, contracts, books of account, and all other property and assets of every kind and description belonging to the partnership; (2) the purchasers acquired the right to continue the business; and (3) the retiring partner reserved the right to enter into a competing business and solicit business from customers formerly doing business with the partnership. In each instance the partners who bought the retiring partner's interest, continued the firm's business under a new partnership agreement. It can be said, therefore, that the Kenworthys secured valuable tangible and intangible assets by their $70,000 payment irrespective of whether the firm had valuable good will. *372 This point can be further emphasized by noting Fow's contractual rights under the partnership agreement of July 1, 1946, if the three Kenworthys had retired by giving the required 30-day written notice prior to the end of the partnership's fiscal year. In that event Fow retained the right to continue to carry on the business without winding up the partnership affairs. The importance that the Kenworthys attached to the retention of this right in themselves is illustrated (1) by the language employed in the supplemental agreement, and (2) by the language employed in the agreement of July 3, 1947. In both instruments the Kenworthys were careful to reserve to themselves the right to continue the business without winding up the partnership affairs. The acquisition of this contract right from Fow was one of the major considerations for the $70,000 payment by the Kenworthys. Under such circumstances it cannot be said that the payment to acquire this contract right was a deductible business expense in computing the taxable incomes of these petitioners; it was a capital expenditure. A more recent case, which has some bearing on the question at issue, is Frank L. Newburger, Jr., 13 T.C. 232 (1949). *373 In that case we held that the payment by a group of Philadelphia partners to a group of New York partners, under an agreement which accelerated the dissolution of the partnership, to be a capital expenditure. The taxpayer contended that the payments were ordinary and necessary expenses because they were made to accelerate dissolution of the firm rather than to acquire any capital asset. The evidence failed to convince us that the payments were current operating expenses paid or incurred merely in producing current income. On the contrary, the evidence showed that the payments were more proximately related to and were paid for the acquisition of assets which were expected to produce income for the purchasing group over a longer, more permanent period. An interesting factor in the Newburger case is that the New York partners, who were selling, had the right under the partnership agreement to continue the business without the capital and services of the purchasing group; but they were fully aware of all aspects of the situation and "drove the best bargain they could in disposing of their interests in the going business of the Philadelphia offices." The situation here is similar in that *374 Fow was getting out, and he drove the best bargain he could in disposing of his interest in the partnership. Cf. Specialty Engineering Co., 12 T.C. 1173 (1949), and Ruth W. Collins, 14 T.C. 301 (1950), where the payments or a determinable portion thereof were held to be capital expenditures. The evidence in these cases is not convincing that the Kenworthys paid the $70,000 as current operating expenses in order to produce current income. On the contrary, the evidence shows that the $70,000 was more proximately related to and was paid to acquire assets which were expected to produce income over a longer, more permanent period. It is firmly established that a partnership interest is a capital asset. Allan S. Lehman, 7 T.C. 1088 (1946) affd., 165 Fed. (2d) 383 (C.A. 2, 1948), cert. den., 334 U.S. 819 (1948), and cases there cited, and the purchase of such an asset from a retiring partner by the remaining partners is a capital transaction.[3] It may well be that the Kenworthys were motivated in making the $70,000 payment by their desire to avoid litigation, to protect and preserve their business, and to remove a detrimental *375 influence therefrom; but the fact remains that as a result of their pro rata payments to Fow each of them increased his own interest proportionately in the excess of the partnership assets over liabilities. Arthur P. Williams, supra.Their motives and desires were incidental to the object which they actually accomplished by paying the $70,000. Finally, we see no merit in petitioners' contention that $60,000 of the $70,000 payment was in lieu of Fow's anticipated earnings for the partnership's fiscal year 1948. The $60,000 figure was simply a yardstick used by counsel for the opposing parties in negotiating *376 a settlement. Whether Fow's share of partnership earnings for the fiscal year 1948 would have equaled $60,000 was purely speculative at July 3, 1947, and this estimated figure cannot be used to reduce petitioners' distributive shares of partnership income. The payment was made by petitioners individually in 1947; it was in no sense a partnership transaction. The parties having agreed that the $5,000 attorney fee paid in 1948 was of the same nature as the $70,000 payment on July 3, 1947, we have found as a fact that the attorney fee was a capital expenditure and not an ordinary and necessary expense. In view of our disposition of the issue raised by the parties with respect to the taxable year 1947 it is unnecessary to consider the alternative question raised by petitioners by their amended petitions with respect to the calendar year 1948. There being no other adjustments involved in the respondent's determinations herein, the deficiencies are approved. Decision will be entered for the respondent. Footnotes
*. Proceedings of the following petitioners are consolidated herewith: Thomas Kenworthy; N. Paul Kenworthy; Thomas Kenworthy, III; Thomas Kenworthy and Marie Kenworthy; Thomas Kenworthy, III, and Mary Wells Kenworthy.↩
1. ↩
Fow's Capital Account 6/30/46
$142,859.20
Excess Fow's Share 1947 profits
over his withdrawals
21,776.89
Amount of Settlement
70,000.00
234,636.09
Less: Cash Withdrawal 7/1/47
$3,000.00
Cadillac Automobile
3,175.79
Philadelphia Income Tax
836.84
7,012.63
Amount of Fow's check
$227,623.46
1. Depreciable assets beginning of year, $21,100.68, less reserve for depreciation of $2,913.54. ↩
2. Depreciable assets beginning of year, $23,980.55, less reserve for depreciation of $6,909.44. ↩
3. Accrued expenses.↩
2. See also Arthur P. Williams, 24 B.T.A. 1070 (1931); Alfred Pincus, 18 B.T.A. 930↩ (1930).
3. This statement is not in conflict with our recent decisions in Gaius G. Gannon, 16 T.C. 1134 (1951), and Palmer Hutcheson, 17 T.C. 14 (1951). We there recognized that the taxpayer's interest in the partnership was a capital asset, 16 T.C. 1139, but the cases turned upon whether there was a "sale" or "exchange" thereof under the similar circumstances of the two cases. We hold that a forfeiture was neither a "sale" nor an "exchange" within the meaning of sections 23 (g) and 117, Internal Revenue Code↩.